AUSA: Karen Reynolds  Telephone: (313) 226-9672
Special Agent: Joshua McLean  Telephone: (313) 570-0645

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
v.

D1 George Rider
D2 Lawrence Rider
D3 Robert White

Case: 2:19-mj-30452
Assigned To : Unassigned
Assign. Date : 8/26/2019
IN RE: SEALED MATTER (CMP)(CMC)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____May 2019____ in the county of ____Wayne____ in the ____Eastern____ District of ____Michigan____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1349 | Conspiracy to commmit mail and wire fraud |
| 18 USC § 844(m) | Conspiracy to commit a felony by using fire |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

Joshua McLean, Special Agent, ATF
Printed name and title

Sworn to before me and signed in my presence.

Date: August 26, 2019

_____
Judge's signature

City and state: Detroit, MI

R. Steven Whalen, U.S. MAGISTRATE JUDGE
Printed name and title

## AFFIDAVIT

I, Joshua McLean being duly sworn, depose and state the following:

1. I have personal knowledge of the facts set forth in this affidavit with the exception of the matters expressly stated to be based upon information and belief.

2. I make this affidavit with personal knowledge based on my participation in this investigation, including witness interviews by myself and/or other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

3. I have been employed as a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since 2014. I am currently assigned to the Detroit, Michigan Field Division, Group III. I am tasked with investigating violations of firearms, arson, fraud, explosives, and narcotics laws. In addition, I have been involved in numerous investigations involving violations of federal firearms, arson, and narcotics laws. Prior to my employment with ATF, I was employed by Wayne State University Police Department for approximately three years in the position of police officer. During this employment, I was assigned to work with ATF Detroit Field Division Group II, tasked with investigating violations of firearms and narcotics laws. In addition, I have a Bachelor's Degree in Criminal Justice from Wayne State University, I have completed both the Criminal Investigator Training Program and Special Agent Basic Training at the Federal Law Enforcement Training Center, and I have completed the Washtenaw Community College Police Academy.

4. I am currently conducting an investigation into the violation of federal laws

by George Gerald RIDER Jr. (B/M, DOB: \*\*/\*\*/1958), Robert Reed WHITE (B/M, DOB: \*\*/\*\*/1970), and Lawrence Dee RIDER (B/M, DOB: \*\*/\*\*/1960). This investigation is focusing on allegations that George RIDER, Robert WHITE, and Lawrence RIDER conspired to use fire to commit mail fraud and wire fraud, felonies that may be prosecuted in a court of the United States.

5.  ATF has been investigating George RIDER and his co-conspirators for numerous arson-for-profit schemes. The following information shows the most current scheme in which George RIDER and his co-conspirators have been involved. During the time of the most current scheme, George RIDER was incarcerated at the Macomb County Jail, located in Mount Clemens, Michigan, awaiting trial on 1st Degree Murder charges. Based on a review of jail calls, George RIDER indicated he needed to raise money for attorney fees. All communications between George Rider and other individuals, described in this affidavit, were initiated by George Rider from his place of incarceration.

6.  During the month of May 2019, members of ATF conducted an interview of a confidential source of information hereafter referred to as "SOI 8.=." SOI 8 stated during the interview that he/she had established a rapport with George RIDER. According to SOI 8, multiple conversations between SOI 8 and George RIDER have led George RIDER to entrust SOI 8 with information regarding various crimes George RIDER has committed. Some of the criminal activity George RIDER told SOI 8 about include information regarding numerous murders, arsons, and fraud. George RIDER stated to SOI 8 that he has set multiple houses on fire and made $100,000 to $200,000 from submitting fraudulent insurance claims after the arsons. During conversations with SOI 8, George RIDER told SOI 8 that he has committed 100 arsons. SOI 8 told George RIDER that he owned a house in Michigan worth approximately $1,000,000. George RIDER then inquired if the house is insured. SOI 8 confirmed to George RIDER that the

2

house is insured and George RIDER told SOI 8 that they could make $2,000,000 by setting it on fire. George RIDER told SOI 8 he would get his brother to set the house on fire. Based on other facts in ATF's continuing investigation, agents know George RIDER is referring to Lawrence RIDER when speaking of his brother. George RIDER also refers to Lawrence RIDER as "Bro." SOI 8 informed George RIDER his Uncle named "Sal" could assist in furthering the arson-for-profit scheme.

7. George RIDER gave SOI 8 two handwritten letters he wanted SOI 8 to have delivered to Lawrence RIDER. SOI 8 gave members of ATF these letters. Both letters were addressed to SR at XXXXX E. 8 Mile Rd., Apt. 40, St. Clair Shores, Michigan. A review of jail calls indicates Lawrence RIDER has connections to SR and to this address. In these letters, George RIDER wrote to "Bro" that he had a job he needed done that would give them both money. George RIDER referred to the house owned by SOI 8 and said that it needed "to be pained [painted] ASAP." SOI 8 explained to ATF that by stating the house should be "painted," George RIDER meant to burn the house. SOI knew this based on his previous conversations with George RIDER about the arson-for-profit scheme. Members of ATF know it is common for George RIDER to speak in "code" in his communications with people outside of the jail. George RIDER speaks in "code" to hide his true intentions from law enforcement. The letters also instructed Lawrence RIDER to expect a call from a person named SAL who would explain the details of the job.

8. On May 16, 2019, George RIDER called Lawrence RIDER at 586-359-XXXX and informed him to expect a call from an individual named SAL on his other phone. George RIDER told Lawrence RIDER to tell SAL he would call him back after speaking to his brother. Lawrence RIDER responded in agreement.

9. On May 19, 2019, an ATF agent acting in an undercover capacity as SAL, hereafter referred to as "UC" or "SAL," called Lawrence RIDER and informed RIDER

3

that he was instructed to contact RIDER. Lawrence RIDER responded that he wanted to ensure he got the UC's number and would call him back. On the same date, Lawrence RIDER called the UC from cellular number (313) 948-XXXX. The UC told Lawrence RIDER his nephew (SOI 8) told him to call. Lawrence RIDER confirmed he was expecting a call from SAL. During the phone conversation, the UC asked if Lawrence RIDER would be doing the work on his house, referring to the planned arson, and Lawrence RIDER responded "Oh yeah, most definitely, I'm the one." During the conversation, Lawrence RIDER responded, "Yeah, I think I know what it is, I still got to look at it." Based on the investigation, agents know Lawrence RIDER was implying he needed to see the house prior to setting the fire.

10. On May 20, 2019, George RIDER called Lawrence RIDER at cellular number 586-539-XXXX. George RIDER asked Lawrence RIDER if he had "heard from anyone." Lawrence RIDER told George RIDER that SAL had called on his other phone.

11. On May 21, 2019, the UC called Lawrence RIDER at 313-948-XXXX. During the phone conversation, the UC confirmed the set "price of 200" George and Lawrence RIDER were expecting for the planned arson-for-profit payout. Lawrence RIDER responded, "yeah I think so, I gotta talk back with them, call me back." Agents know this meant Lawrence RIDER believed $200,000 was the price set, but Lawrence RIDER needed to check with George RIDER to make sure.

12. On May 27, 2019, the UC contacted Lawrence RIDER at cellular number 313-948-XXXX. During the call, Lawrence RIDER told the UC he would be out of town for two to three weeks. The UC asked if Lawrence RIDER thought they would be able to "Make this thing happen" when Lawrence RIDER got back; Lawrence RIDER responded "Yeah, most definitely."

13. On June 3, 2019, George RIDER called Lawrence RIDER on cellular number 313-948-XXXX. George RIDER inquired whether Lawrence RIDER had

4

SAL's number. Lawrence RIDER expressed concerns that SAL was a confidential informant.

14. During a recorded phone conversation on June 8, 2019, George RIDER spoke with a person he referred to as "X." This person was later identified by ATF as Robert WHITE. During the conversation, George RIDER told WHITE "I just wish he could show you what he know." Based on the investigation, agents know this to mean that George RIDER would like Lawrence RIDER to show WHITE what he knows about the arson-for-profit scheme. WHITE responded that he would talk to Lawrence RIDER again. George RIDER instructed WHITE to have Lawrence RIDER introduce him to SAL and to tell him what to do.

15. On June 9, 2019, George RIDER called WHITE and informed him that Lawrence RIDER would be giving WHITE a phone number. George RIDER stated he would give WHITE more information regarding the number later. WHITE responded that he just spoke with Lawrence RIDER to discuss everything.

16. On June 10, 2019, ATF agents met with SOI 8 who provided agents with an envelope from George RIDER. SOI 8 told ATF agents George RIDER requested SOI 8 to have the letter passed through SOI 8's attorney. Contained within the envelope was a handwritten letter believed by ATF to be written by George RIDER. During the course of this investigation, members of ATF have reviewed multiple handwritten letters by George RIDER, which have familiarized agents with George RIDER's handwriting. The letter contained instructions for Lawrence RIDER and Robert WHITE. The letter included the following statements: "Make sure you get the money today!"; "I need you to paint this house"; "Sal will show you the house, and give you access to get in"; "He will give you 125k, keep 50k and give 75k…he will instruct you on how to paint a house"; "This is a break for us to get the law firm"; "The house, it must look like a[n] accident"; "Get a[n] electrician out there to do it"; "This is very important, and it will

5

help us get that law firm." The letter also described the location of the house as the same area given to George RIDER by SOI 8. Shown below is a copy of the letter described above.

> Make sure you get the Haney law.

Hey my Brother

I need you to [illegible] this house.
If you don't, [illegible]
[illegible]

The house is in [Burlington?] [illegible]
So [illegible], are
sure you [illegible]

Please understand [illegible]
[illegible]

[illegible] ... [illegible]

[illegible]

[illegible]

Give Sal [illegible]
and [illegible]

If [illegible] a accident
If [illegible] electrician [illegible]
[illegible]

7

17. On the same date, George RIDER contacted WHITE on cellular phone number 734-961-XXXX. George RIDER informed WHITE a person would be meeting up with him in order to give him something. ATF believes based on its investigation that the conversation is a reference to the delivery of the above-described envelope containing the handwritten letter. WHITE responded in agreement. George RIDER directed WHITE to ensure he got a phone number from Lawrence RIDER so WHITE could call "him," referring to SAL, and meet up with him. On the same date, George RIDER also called Lawrence RIDER. During this phone conversation, George RIDER stated to Lawrence RIDER, "All you gotta do is help him, if he working on that case." Based on this investigation, agents know George RIDER was saying he wanted Lawrence RIDER to help WHITE with the arson-for-profit scheme.

18. On June 11, 2019, the UC received a text message from WHITE stating that he was a friend of a friend and to call him back as soon as possible. On the same date, WHITE called the UC and left a voicemail stating his name is Robert WHITE, and mentioned George RIDER's name. The UC returned the call to WHITE. WHITE introduced himself as Robert WHITE and told him George RIDER instructed him to call. George RIDER later spoke with Lawrence RIDER and directed him to contact WHITE who would have an item for him after meeting with SAL.

19. On June 12, 2019, George RIDER spoke with Lawrence RIDER and asked if he had talked to WHITE. George RIDER instructed Lawrence RIDER to "stay on it."

20. On June 13, 2019, George RIDER called Lawrence RIDER and stated, "just uh holla, trying to stay on "X" (WHITE) man, to make it happen man." Lawrence RIDER responded "yeah" and advised that he had talked to him (WHITE) yesterday. Agents know this to mean, George RIDER wanted Lawrence RIDER to ensure WHITE was following through with the arson-for-profit scheme. Between June 14 and June 18,

8

2019, George RIDER spoke with Lawrence RIDER and WHITE multiple times in order to figure out what to tell SAL about why SAL would be working with WHITE instead of Lawrence RIDER.

21. On June 19, 2019, the UC spoke with WHITE. WHITE indicated he was told to contact the UC by George RIDER. After questioning by the UC, WHITE admitted he knew what the UC was expecting and that they wanted to collect insurance money and get rid of the house. WHITE indicated he knew how to do it and would be handling it with no problems. When the UC stated this was the first time he was doing this and did not want "it" coming back on him, WHITE stated, "I got you, trust me, I got you." WHITE told the UC he would need the keys to the house and would observe the neighbors. WHITE indicated he would need approximately one week after they meet. When asked about price, WHITE replied that they would handle it. They then discussed the package intended for Lawrence RIDER and WHITE.

22. On the same date, the UC spoke with Lawrence RIDER. During the conversation, Lawrence RIDER directed the UC to speak with WHITE and to provide him with the aforementioned package. Lawrence RIDER assured the UC that WHITE was trustworthy. When asked if WHITE knew what he was doing, Lawrence RIDER replied that there was no need for concern. The UC asked if he could continue to reach out to Lawrence RIDER even though he would continue contacting WHITE and Lawrence RIDER responded, "Yeah, always…I'm going to be right on it…I got him, I'm right on top of him." Lawrence RIDER indicated he speaks with WHITE every day and would be helping WHITE and assisting him. Lawrence RIDER assured the UC that he would know everything discussed between WHITE and the UC. Lawrence RIDER indicated the UC would drive WHITE past the house. After the UC mentioned showing WHITE the house and giving him the keys, Lawrence RIDER stated, "shouldn't be long, shouldn't be long." Lawrence RIDER confirmed that the UC would have to get any

9

people out of the house and stated "two, three days." Based on the investigation, agents know these statements to mean Lawrence RIDER could get the house set on fire in the near future.

23. Between July 2, and July 9, 2019, a series of communications occurred between the UC and WHITE. During these conversations, WHITE ensured nothing would come back to the UC, not to worry, and everything would go smoothly. They planned to meet on July 9, 2019. On July 8, 2019, WHITE informed George RIDER via a jail call that he would be meeting with the UC.

24. On July 9, 2019, the UC and WHITE met in-person and discussed the plan for the arson for profit scheme. During the meeting, WHITE told the UC to take him by the house and he would do everything else. WHITE stated this would include surveying the house and neighbors. WHITE told the UC to leave household items in the garage. When the UC stated he had concerns about the insurance company, WHITE responded that he would not have to worry and everything is untraceable. WHITE proceeded to say, "they aren't going to know shit, accident, that's what it's going to come down to." When the UC asked if that was the way it had been in the past, WHITE responded, "yep, accident that's it." WHITE assured the UC nobody would be injured and that is why he would need time to surveil the neighbors. The UC asked if it was going to be electrical and WHITE responded that he would inform him after it was done. The UC inquired again about the insurance company and WHITE explained to the UC that the insurance company would investigate the origin of the fire to determine if it was arson and the insurance investigators would probably question the UC. WHITE advised the UC that after the people move out of the house, the UC should leave the house as they left it. WHITE also instructed the UC to be out of sight on the day of the fire. Following this meeting between WHITE and the UC, George RIDER is recorded on a phone call directing WHITE to try to get money from the UC.

10

25. During the meeting between the UC and WHITE, members of ATF conducted surveillance in the area of the undercover meeting. Members of ATF observed WHITE arrive at the location and WHITE was positively identified during the undercover operation. Following the undercover operation, members of ATF surveilled WHITE from the undercover meeting location to the Mount Clemens, Michigan area. It was later discovered by members of ATF that WHITE was on GPS monitoring by the Macomb County Community Corrections. ATF obtained information from the GPS monitoring system, which shows WHITE's GPS tether locations coincide with the locations members of ATF observed WHITE.

26. In the weeks following the undercover meeting with WHITE, WHITE and the UC had correspondence pertaining to the exchange of funds from the UC to WHITE. These phone conversations and text messages show WHITE was expecting a good-faith down payment prior to the house being set on fire. During the same period, multiple jail phone call conversations between George RIDER and WHITE show they both had an expectation of receiving money prior to the house being set on fire.

27. On August 16, 2019, the UC conducted a wire transfer of $1,000 to a bank account provided to the UC by WHITE. The wire transfer originated in Berkeley Heights, New Jersey and was sent to a bank account with a credit union based out of Mount Clemens, Michigan. Following the wire transfer, WHITE confirmed to the UC he had received the funds and was expecting more in the future.

## Conclusion

28. Based on the above information, I have probable cause to believe that George RIDER, Lawrence RIDER, and Robert WHITE conspired to use fire to commit mail fraud and wire fraud in violation of Title 18 U.S.C. § 1341 and wire fraud in violation of Title 18 U.S.C. § 1343, felonies that may be prosecuted in a court of the United States, all in violation of Title 18 U.S.C. § 1349 and 844(m). These violations occurring within the Eastern District of Michigan.

Joshua McLean, Special Agent
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: AUG 2 – 2019

R. STEVEN WHALEN
U. S. District Court Magistrate Judge